# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

WAYNE PHILLIP VANCE,

                            Plaintiff,

                                        9:18-CV-748
    v.                                      (BKS/ATB)

THE STATE OF NEW YORK DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
et. al.

                            Defendants.

WAYNE PHILLIP VANCE, Plaintiff, pro se
JONATHAN REINER, Asst. Attorney General, for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

      This matter has been referred to me for Report and Recommendation by the

Honorable Brenda K. Sannes, United States District Judge.  On June 21, 2018, plaintiff

commenced this civil rights action pursuant to 42 U.S.C. § 1983 against, *inter alia*, the

New York State Department of Corrections and Community Supervision ("DOCCS")

and individuals employed by DOCCS.  (Complaint ("Compl."), Dkt. No. 1).  By

Decision and Order dated November 19, 2018, the Honorable Mae A. D'Agostino[1]

dismissed several defendants and causes of action pursuant to 28 U.S.C. §§ 1915,

1915A.  (Dkt. No. 25).  On April 8, 2019, Judge D'Agostino dismissed additional

defendants and causes of actions pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).

(Dkt. No. 52).  Liberally construed, the surviving claims in plaintiff's complaint include

---

[1] By order of recusal, this matter was reassigned to Judge Sannes for all further proceedings on
August 26, 2019.  (Dkt. No. 79).

(1) Eighth Amendment excessive force claims against defendants Rief, Barcomb, Engstrom, Waldron, Rowe, Baxter, Russell, Cox, and Rufa; (2) Eighth Amendment deliberate medical indifference claim against defendant Waterson; and (3) Fourteenth Amendment due process claims against defendants Bullis and Venettozzi arising out of a June 2016 disciplinary proceeding.  (Dkt. Nos. 25 at 32-33; 52 at 3-4).

On August 24, 2020, defendants made a partial motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 127).  Defendants moved to dismiss plaintiff's (1) deliberate medical indifference claim against defendant Waterson, and his (2) due process claim against defendant Venettozzi. (*Id.*)  On November 30, 2020, I recommended denying defendants' motion. (Dkt. No. 137).  Judge Sannes adopted my recommendation on December 18, 2020. (Dkt. No. 143).

After some initial reluctance by plaintiff, resulting in court intervention,[2] plaintiff was deposed remotely on January 21, 2021. (Reiner Decl. Ex. A) (Dkt. No. 169-9).  On April 28, 2021, plaintiff filed a motion for preliminary injunctive relief, which was denied by Judge Sannes on May 5, 2021. (Dkt. Nos. 159, 160).

Presently before this court is defendants' motion for summary judgment pursuant

---

[2] I held a telephone conference on December 10, 2020 at which I warned plaintiff that the failure to participate in his deposition could, in the appropriate circumstances, lead to a dismissal for failure to prosecute. (Text Entry Dec. 10, 2020).  Plaintiff was so disruptive during the call that I terminated the telephone conference. (*Id.*)  On December 23, 2020, defendants made a motion to dismiss for failure to prosecute based on plaintiff's continued refusal to participate in a deposition. (Dkt. No. 146).  On December 28, 2020, I issued a Text Order, admonishing plaintiff, but stating that dismissal at that time, was not the appropriate sanction.  I issued another warning regarding plaintiff's failure to cooperate. (*Id.*)  I held the motion to dismiss for lack of prosecution "in abeyance" until plaintiff submitted to his deposition and answered questions, and on April 20, 2021, I denied the defendants' motion as moot based a confirmation that plaintiff submitted to his deposition in January 2021. (Dkt. No. 158).

to Fed. R. Civ. P. 56. (Dkt. No. 161).  Plaintiff responded in opposition to the motion and in further support of his renewed motion to "supplement."[3] (Dkt. No. 169). He also asks the court to decide the case in his favor. (*Id.*)  Defendants have filed a reply. (Dkt. No. 173).  For the following reasons, this court agrees with some of the defendants' arguments and will recommend granting the motion in part and denying the motion in part.

## I.    Facts and Contentions

In her prior order, Judge D'Agostino summarized the facts as stated in plaintiff's lengthy complaint. (Dkt. No. 25 at 4-10).  Subsequently, plaintiff submitted various documents cited as exhibits in the original complaint, which have been docketed accordingly.  (*See* Dkt. Nos. 1, 64).  The court will briefly review the facts as necessary to discuss the issues relevant to the pending motion.  Defendants have filed many exhibits, including DOCCS records, declarations from defendants and third parties, and plaintiff's deposition in support of their motion. (*See generally* Dkt. No. 161-3 - 161-9).

### A.    Use of Force at Clinton Correctional Facility

Plaintiff alleges that he was assaulted on May 11, 2016 by several correctional officers as a means of intimidation and to interfere with plaintiff's pending legal actions.  (Compl. at ¶¶ 10(e), 14).  After the assault, plaintiff was restrained and escorted to the medical unit at Clinton for examination.  (*Id.* at ¶ 12).  Plaintiff claims

---

[3] Plaintiff's original motion to supplement and for various other forms of relief was denied on September 16, 2019. (Dkt. No. 85).  Plaintiff's renewed motion to supplement was made after defendants' motion for summary judgment was filed and was denied on June 16, 2021. (Dkt. No. 174). Plaintiff filed his motion to supplement prior to filing his response to the motion for summary judgment, but his response to the summary judgment motion contained further argument in support of his motion to supplement.

that he suffered multiple injuries from the assault, including finger and fibula fractures. (*Id.* at ¶ 14(a)-(x)).  After the incident, plaintiff was escorted to the special housing unit ("SHU"), and he was issued a misbehavior report for, inter alia, assaulting a correctional officer.  (*Id.* at ¶¶ 12-13, 18).

## B.    Subsequent Disciplinary Hearing

Defendant Hearing Officer ("H.O.") Bullis conducted a disciplinary hearing on June 29, 2016, with respect to the misbehavior report issued to plaintiff following the alleged assault.  (*Id*. ¶ 18).  At the conclusion of the hearing, H.O. Bullis found plaintiff guilty of assault on staff, violent conduct, creating a disturbance, and refusing a direct order. (*Id.* at ¶ 18, Exhs. 4, 8).

Plaintiff appealed H.O. Bullis's disciplinary hearing determination. On September 6, 2016, defendant Donald A. Venettozzi, the Director of the Special Housing/Inmate Disciplinary Program, issued a one-page "Review of Superintendent's Hearing," affirming H.O. Bullis's determination.  (Dkt. No. 1-14 at 26).  The decision states: "On behalf of the Commissioner and in response to your recent letter of appeal, please be advised that your superintendent's hearing of June 29, 2016, has been reviewed and affirmed on September 6, 2016."  (*Id.*).

On November 22, 2016, the June 2016 hearing determination was administratively reversed by Acting Director of Special Housing/Inmate Discipline Anthony Rodriguez, and a rehearing was ordered.[4]  (Compl. at ¶ 23; Dkt. No. 1-14 at

---

[4] This decision was rendered based upon DOCCS's receipt of a letter of reconsideration, dated October 16, 2016 and prepared by Prisoners' Legal Services of New York on behalf of the plaintiff. (*See* Dkt. No. 1-14 at 33-34; Venettozzi Decl. Ex. A at 7).

28; Venettozzi Decl. ¶ 8 & Ex. A at 3-5 (Dkt. No. 161-6)). The rehearing was held on December 21, 2016 by H.O. M. Liberty at Upstate Correctional Facility ("Upstate"), where plaintiff had since been transferred. (Compl. at ¶ 26; Venettozzi Decl. Ex. B at 1). After the rehearing, plaintiff was once again found guilty of assault on staff, violent conduct, creating a disturbance, and refusing a direct order. (Venettozzi Decl. Ex. B at 2). H.O. Liberty imposed the same sentence after the rehearing as H.O. Bullis imposed after the first hearing. (Venettozzi Decl. ¶ 10 & Ex. A at 17, Ex. B at 2). Director Venettozzi affirmed the rehearing determination on February 8, 2017. (Venettozzi Decl. Ex. B at 1).

### C.    Use of Force/Medical Care at Upstate Correctional Facility

Plaintiff alleges that he was assaulted by two correctional officers inside his cell while confined at Upstate on August 26, 2016. (Compl. at ¶ 33). After the assault, plaintiff was placed in mechanical restraints and "escorted in a wheelchair to a holding tank to be asked a few questions by [defendant] Nurse G. Waterson." (*Id.*). Plaintiff claims that Nurse Waterson refused to conduct an examination, or diagnose and treat all of plaintiff's injuries.[5] (Compl. ¶ 59-61). Plaintiff alleges to have suffered an "abnormal left lower rib" and a "refractured" left fibula as a result of the assault. (*Id.* at ¶ 33(a)).

## II.    **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material

---

[5] The complaint incorrectly cited the May 11th incident in conjunction with defendant Waterson's conduct, but plaintiff clearly states that defendant Waterson worked at "Upstate," where he was allegedly assaulted on August 26th. (*See* Compl. ¶ 59). Plaintiff has simply listed the incorrect date in this paragraph of the complaint.

fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III.  <u>Exhaustion of Administrative Remedies</u>

### A.    **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an

inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC").  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the

IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id.* § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* did away with the "special circumstances"

8

exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*, __ U.S. at __, 136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580.  An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, __ U.S. at __, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply.  *Id*.  The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief.  *Id.* at 1859.  The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it."  *Id.*  Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure.  *Id.* at 1860.

## B.    Analysis

Defendants argue that plaintiff never filed a grievance, complaining about the alleged lack of adequate medical care by defendant Waterson after the August 26, 2016

9

incident.  Defendants have filed the declaration of Rachael Seguin, the Assistant Director of the IGP for DOCCS. (Seguin Decl. ¶ 1) (Dkt. No. 161-8).  Assistant Director Seguin states that she has conducted a search of the CORC records for any grievance appeals filed by plaintiff regarding his claim that defendant Waterson refused to evaluate, diagnose, treat, and document the injuries that plaintiff allegedly sustained after the August 26th incident. (Seguin Decl. ¶¶ 10, 15, 16).  Assistant Director Seguin's search revealed that the CORC did not receive any such appeals filed by plaintiff. (Seguin Decl. ¶ 16 & Ex. A).

However, Assistant Director Seguin's search did reveal an appeal to the CORC filed by plaintiff complaining only of the alleged use of excessive force on August 26, 2016. (Seguin Decl. ¶ 17 & Ex. B).  Exhibit B is a copy of plaintiff's grievance, alleging that he was the victim of excessive force on August 26, 2016, but the grievance does not mention denial of medical care or inadequate medical care, nor does it name defendant Waterson.  Plaintiff filed the initial grievance on September 26, 2016. (Seguin Decl. Ex. B at 3, 4).[6]  The only claim made in the grievance was that plaintiff was assaulted by corrections officers after they escorted him to a new housing area. (Seguin Decl. Ex. B at 4). The IGRC response was a "pass through" to the Superintendent, and on October 9, 2016, the Superintendent denied the grievance. (Seguin Decl. Ex. B at 3).

Plaintiff signed his appeal statement to the CORC on October 23, 2016. (Seguin Decl. Ex. B at 5).  The memoranda written during the investigation of plaintiff's claims

---

[6] Page 3 of Exhibit B is a summary of the grievance process, and page 4 is plaintiff's actual hand-written grievance.

are attached to the appeal. (Seguin Decl. Ex. B at 6-10).  The memoranda mention that plaintiff was examined by medical personnel after the use of force,[7] but plaintiff made no allegations about that care in his grievance or in any of the subsequent appeals.[8] Each officer involved in the use of force submitted a memorandum for the investigation. (*Id.*)

The CORC's response denying plaintiff's appeal of the assault grievance mentions only that plaintiff was "immediately examined by medical staff for a superficial scrape on his shoulder." (Seguin Decl. Ex. B at 1).  Plaintiff is well-aware of how to use the grievance program, and in fact, filed a grievance in May of 2016 regarding his medical care after the incident at Clinton, appealing it all the way to the CORC.[9] (Compl. Ex. 1 at 7) (CORC response to plaintiff's medical care grievance after May 11 incident).  Thus, plaintiff cannot claim that the grievance process was unavailable to him.

In one part of plaintiff's response to defendants' statement of material facts, he

---

[7] There is no dispute that there was a use of force incident involving plaintiff on August 26, 2016.  Defendants claim that plaintiff assaulted the officers, while plaintiff claims that the officers assaulted him without provocation.

[8] The "Use of Force Report" states that plaintiff was seen by "medical," and he had a minor scrape on his right shoulder. (Seguin Decl. Ex. B at 14, 17-18).  Defendant Waterson signed the report and listed the officers' injuries in addition to plaintiff's injuries. (Seguin Decl. Ex. B at 14).  Defendant Waterson stated that plaintiff had an abrasion to his right shoulder, claimed injury to his left ankle/leg, but that no injury was noted. (*Id.*)  Plaintiff did not make any claims regarding defendant Waterson's care of his injuries in his grievance, even though he had every opportunity to do so.  The Use of Force Report is extensive and contains an exact description of the force used, the officers involved, and the reason for the use of force.  The officers claimed that plaintiff abruptly turned and assaulted one of the escorting officers. (Seguin Decl. Ex. B at 19).

[9] The court notes that in his complaint, plaintiff cited the grievance that he filed after the May 11th incident as the administrative remedy exhaustion for the allegedly unconstitutional medical care that he received after the August 26th incident. (*See* Compl. ¶¶ 59-62).

11

states that " I admit that I have exhausted my administrative remedies to attempt to resolve my on-going problems with medical staff."[10] (Pl.'s Response to the Defendants' Statement of Material Facts ¶ 35).  Plaintiff has, in fact, filed grievances challenging his medical care, but not relative to the August 26th incident.  However, it is clear from his actual grievance regarding the August 26th incident that plaintiff did not challenge the medical care he received after that incident, and he did not mention defendant Waterson.  The fact that plaintiff may have filed other grievances regarding his "ongoing" medical care does not suffice to exhaust his remedies with respect to the care he received after the August 26th incident.  Thus, plaintiff's claim against defendant Waterson may be dismissed for failure to exhaust his administrative remedies.

## IV.    **Excessive Force**

### A.    **Legal Standards**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "'inconsistent with the contemporary

---

[10] Plaintiff's responses to defendants' motion are a confusing mix of "admissions" that are not really responsive to the defendants' statements of material fact (Dkt. No. 169-2) and outlandish demands for relief, including a demand for "female bodyguards" and for the "U.S. Government" to provide plaintiff with "a very beautiful, intelligent, skilled, and healthy female companion who shall be appointed to provide him assistance of the day of his release from the custody of defendants until he depart[s] from this world." (Dkt. No. 169 at 6).

standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used;

the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

**B.    Analysis**

Defendants argue that plaintiff has failed to raise an issue of material fact as to defendants' conduct during both the May 2016 and the August 2016 incidents, and the claims should be dismissed on the merits. This court does not agree. Generally, "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. *See also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Defendants cite *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) for the proposition that a court may grant summary judgment on an excessive force claim when the only allegations supporting the claim are the plaintiff's unsupported statements.

However, *Jeffreys* was an unusual situation in which the plaintiff claimed that officers used excessive force and threw him out of a window. The plaintiff's allegations against the officers came several months after the alleged incident, and there was no evidence of any use of force by the officers. In addition, on at least one occasion Mr. Jeffreys admitted jumping out of the window himself. *Id.* at 551-53. Thus, there were also substantial inconsistencies in the plaintiff's testimony. As discussed below, this case is distinguishable from *Jeffreys*.

### 1.    May 11th Incident

Defendants Barcomb and Reif[11] argue that they should be dismissed from this action because neither defendant was present or involved in the use of force on May 11, 2016. Each officer has submitted a declaration, affirming that he was not involved in the use May 11th use of force against the plaintiff. (Barcomb Decl., Reif Decl.) (Dkt. Nos. 161-3, 161-4). Officer Reif states that he arrived at the location after plaintiff was secured and was walking away, and he did not use any force on plaintiff on that date. (Reif Decl. ¶¶ 5-7). Defendant Barcomb states that he was "not present" for the use of force against plaintiff on May 11, 2016, and he did not use any force against plaintiff on that date. (Barcomb Decl. ¶¶ 5-6). The court notes that the letter written for plaintiff by Prisoners' Legal Services mentions only that defendants Engstrom, Waldron, Baxter, and Rowe were involved in the use of force. (Venettozzi Decl. Ex. A at 6-7).

In his complaint, plaintiff alleged that J. Reif and S. Barcomb "controlled the inmate gates inside the officers' cage." (Compl. ¶ 14). Plaintiff claims that Officer Rowe struck him first in the "blind side," and then the other defendants attacked him. (Pl.'s Dep. at 51, 60, 63). Defendant Engstrom hit him in the face several times with a closed fist. (*Id.* at 51). He then states that after the attack began, defendants Reif, Barcomb, and Baxter struck plaintiff with several closed-fist punches to the head. (Compl. ¶ 14). During his deposition, plaintiff read from his complaint, which included the claim that both defendants Reif and Barcomb participated in the use of force, and he

---

[11] This defendant's name has been spelled "Reif" and "Rief." According to his declaration, the correct spelling is "Reif," and the court will refer to him with the proper spelling of his name.

testified to the same.[12] (Pl.'s Dep. at 51-64).

Although the "Unusual Incident Report" ("UI") indicates that only defendants Engstrom, Waldron, Baxter, and Rowe were involved in the actual use of force, plaintiff has claimed that defendants Reif and Barcomb controlled gates 9 and 10. The complaint does not provide any details regarding the actions of Reif and Barcomb. (Compl. ¶ 14). However, it is unclear whether either of these defendants may have witnessed the incident and failed to intervene,[13] even though their declarations state that they did not participate in the use of force, which could have explained the absence of their names from the UI. Plaintiff requested these defendants as witnesses at his second hearing. (Venettozzi Decl. Ex. B at 109). It does not appear that they testified, and there is no transcript of the second hearing in the record. Defendant Reif does admit in his declaration that he did "arrive at the location" of the May 11th incident, but plaintiff was already secured and was being escorted away. (Reif Decl. ¶ 6). Even though plaintiff's success establishing the involvement of either defendants Reif or Barcomb may be slight, this court hesitates to make this credibility finding on summary judgment.

Defendant Engstrom admits hitting plaintiff several times in the face with a closed fist. Even assuming that plaintiff threw the first punch, as the defendants

---

[12] The transcript of plaintiff's deposition refers to these defendants as "Reeve" and "Barca." (*See e.g.* Pl.'s Dep. at 51, 64).

[13] "'It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.'" *Jackson v. Nassau County*, No. 18-CV-3007(JS/AKT), __ F. Supp. 3d __, 2021 WL 3207168, at *21 (E.D.N.Y. July 28, 2021) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

contend,[14] a jury would still have to determine whether the defendants' response was excessive. The court notes that the plaintiff's guilty finding at the disciplinary hearings does not change the court's analysis. Plaintiff could be guilty of assaulting an officer, while the officers' response could later be found to be excessive. There is no question that there was a use of force, that there were at least four officers involved, that defendant Engstrom hit plaintiff in the face more than once, and that plaintiff suffered some injuries. The extent of the force and the reasonableness of the response are questions of fact that the court should not attempt to resolve on a motion for summary judgment.

### 2.    August 26th Incident (Upstate)

With respect to the August 26th incident, plaintiff alleges that defendants Russell and Cox came to his cell at Upstate to escort him to a new cell for a "sudden cell change." (Compl. ¶ 33). Before escorting him to the new cell, the defendants applied mechanical restraints. (*Id.*) Upon their arrival at plaintiff's new housing location, plaintiff claims that he was given an order to enter the cell with his personal property, while his hands remained handcuffed in front of him. (*Id.*) In his complaint, plaintiff states that officers Russell and Cox "rushed" into the cell to attack him, using body holds to take him to the ground and punching plaintiff in the face. Plaintiff also alleges that defendant Rufa arrived to assist and repeatedly jumped on plaintiff's lower leg. The officers then "repositioned" the mechanical restraints so that plaintiff's hands were behind his back and brought him by wheelchair to a "holding tank," where he was

---

[14] The court makes no such finding. The fact is being assumed for purposes of the legal analysis.

asked a few questions by defendant Waterson. (*Id.*)

At his deposition, plaintiff began by reading the portion of his complaint dealing with the August 26th incident into the record. (Pl.'s Dep. at 87-88). Later, he answered specific questions about the incident, naming defendants Russell and Cox as the escorting officers. (*Id.* at 96). Later, plaintiff stated that defendant Rufa jumped on his leg after he had been taken down to the ground. (*Id.* at 99). Plaintiff testified that he was "defenseless," and that the officers "rushed" into his cell. (*Id.* at 101-102). Plaintiff maintained that he was in mechanical restraints during the entire incident and did not show any signs of aggression which would have caused such a violent reaction by the officers. (*Id.* at 107).

The officers claim that they were responding to plaintiff's aggressive behavior, and plaintiff claims that the officers attacked him without provocation. Defendants argue that plaintiff has given "evolving" accounts of the incident. (Def.s' Mem. at 20-24). In his complaint, plaintiff alleged that he was escorted to the cell, and the assault occurred with his personal property in his hands. In his grievance, he claimed that he put his personal property down, and turned around to complain about his mattress and the "door," and that is when the officers attacked him. (*Id.* at 21) (citing Compl. Ex. 1 at 6). Defendants also state that plaintiff has been inconsistent when alleging how defendant Russell and Cox took plaintiff down to the floor. (Def.s' Mem. at 21). In his complaint and at his deposition plaintiff alleged that he was taken down to the floor immediately, while his grievance states that the defendants forced him onto a table first. (*Id.*) (citing Compl. Ex. 1 at 6, Pl.'s Dep. at 88). Finally, defendants claim that plaintiff

18

has embellished the number of punches he sustained and the severity of what was done to his leg. (Def.s' Mem. at 21-22). For the above reasons, defendants argue that the court should find on summary judgment, that no reasonable jury could find for plaintiff.

However, again, there is no question that force was used against plaintiff. The UI is attached to the Seguin Declaration. (Seguin Decl. Ex. B at 13). Plaintiff filed a grievance after the incident in which he claimed that the officers assaulted him. (Compl. Ex. 1 at 6). The officers denied assaulting plaintiff and alleged that plaintiff turned and attempted to strike defendant Russell. (Seguin Decl. Ex. B at 13). The UI states that all four responding officers "used body holds to restrain the inmate." (*Id.*) An issue of fact remains as to whether the force used was excessive regardless of what or who initiated the use of force. Plaintiff's allegedly inconsistent statements may be considered at trial as indicative of his lack of credibility, but this court is not in a position on a motion for summary judgment to make that determination.

## V.    **Due Process**

### A.    **Legal Standards**

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint

which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (*citing, inter alia, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

## B.    Analysis

After the use of force incident on May 11, 2016, plaintiff was charged with violent conduct, creating a disturbance, assault on staff, and refusing a direct order. (Venettozzi Decl. Ex. A at 26). After a hearing which began May 17, 2016 and ended June 29, 2016, defendant Bullis found plaintiff guilty of all charges and sentenced plaintiff to, inter alia, 205 days in the SHU. The hearing was initially affirmed, but later reversed after a letter from Prisoner's Legal Services on plaintiff's behalf. The hearing was reversed for "failure to maintain a complete electronic record of the hearing." (Venettozzi Decl. Ex. A at 4). A copy of that transcript is attached to defendant Bullis's declaration in support of the summary judgment motion. (Bullis

20

Decl. Ex. A at 4-202). The transcript is almost completely incomprehensible. The number of "inaudible" sections is remarkable, and the administrative reversal of the outcome of the first hearing understandable.

In any event, the plaintiff received a rehearing by a different officer at a different facility.[15] Plaintiff was again found guilty of the same four charges, the identical sentence was imposed, and the hearing was affirmed administratively. Plaintiff was credited with all of the time that he spent in SHU while the rehearing was conducted. Even if plaintiff's due process rights were violated as a result of the first hearing,[16] he was afforded all the process that he was due by the rehearing and did not suffer any injury as a result. It is well-settled that when an inmate's confinement to SHU was entirely attributable to the ruling following the second hearing, and plaintiff received credit on his sentence for the time that he spent in SHU as a result of the first hearing, plaintiff's due process rights were not violated. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). *See Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998) (where all findings from the first hearing are vacated and the same penalty imposed after the second hearing, the court need not consider allegations that due process was violated as the result of the first hearing). Thus, plaintiff's due process claims against defendants Bullis and Venettozzi may be dismissed.[17]

---

[15] Plaintiff continued to be disruptive at the second hearing, and Hearing Officer Liberty was forced to exclude him from the last part of the disciplinary hearing as a result. (Venettozzi Decl. Ex. B at 7).

[16] The court makes no such finding.

[17] The court notes that defendants also argue that defendant Venettozzi was not personally involved in the due process violations that allegedly occurred at plaintiff's first hearing. Defendants

## CONCLUSION

If the court adopts this recommendation, the remaining causes of action would be plaintiff's excessive force claims regarding the May 11, 2016 and the August 26, 2016 incidents against defendants Engstrom, Waldron, Rowe, Baxter, Reif, Barcomb, Russell, Cox, and Rufa.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 161) be **GRANTED IN PART** as to defendants **Bullis, Venettozzi, and Waterson**, and the complaint be **DISMISSED IN ITS ENTIRETY AS TO THESE DEFENDANTS**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 161) be **DENIED IN ALL OTHER RESPECTS**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS**

---

made the same argument in their motion to dismiss, which I recommended denying and Judge Sannes affirmed.  Prior caselaw was split on the issue of personal involvement of the officer who affirms the hearing decision. (*See* Dkt. No. 137 at 9-12).  Given my finding that plaintiff's rehearing afforded plaintiff all the process he was due because he did not suffer additional confinement, I do not need to reach defendant Venettozzi's argument regarding personal involvement.  I would note, however, that after this court's recommendation on the motion to dismiss, the Second Circuit issued a decision relevant to the issue of personal involvement.  In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit held that, in order to be personally responsible for a constitutional violation, the defendant must have had the requisite state of mind for the violation.  *Tangretti* has significantly narrowed situations in which personal involvement of a superior will be found.  Recent cases have held that simply affirming the result of a disciplinary hearing does not per se establish the personal involvement of the appellate officer. *Washington v. Fitzpatrick*, No. 20-CV-911, 2021 WL 966085, at *10 (S.D.N.Y. Mar. 15, 2021) (citing inter alia *Smart v. Annucci*, No. 19-CV-7908, at *6-7 (S.D.N.Y Jan. 26, 2021).

**WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 12, 2021

Andrew T. Baxter
U.S. Magistrate Judge